**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JACQUELIN HARRIS | ) | |
| | ) | |
| Plaintiff, | ) | 05-0882 |
| | ) | |
| v. | ) | Judge Conti |
| | ) | Magistrate Judge Lenihan |
| WASHINGTON COUNTY CHILDREN & | ) | |
| YOUTH SERVICES, | ) | |
| | ) | Re: Doc. No. 22 |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

I.     RECOMMENDATION

It is respectfully recommended that Defendant Washington County Children &

Youth Services' Motion for Summary Judgment at Doc. No. 22 be denied.

II.     REPORT

Currently before the Court is Defendant's Motion for Summary Judgment (Doc.

No. 22) in this employment discrimination case.  In her one-count Complaint, Plaintiff has

alleged claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000(e), et seq.  Plaintiff appears to allege claims for hostile work environment, employment

discrimination (disparate treatment) based on race, constructive discharge, and retaliation by the

Defendant, Washington County Children & Youth Services (hereinafter "Defendant" or "CYS").

A.     Relevant Facts

On October 18, 2006, Defendant filed its Motion for Summary Judgment, Brief in

Support, Statement of Facts and Appendix.  (Doc. Nos. 22, 23 24 & 25).  After the due date for

Plaintiff's responsive brief, Plaintiff filed her First Motion for Extension of Time to File Responses to the above.  (Doc. No. 26.)  On November 28, 2006, the Court granted Plaintiff's Motion for Extension of Time and ordered that Plaintiff respond by December 20, 2006.  As indicated in a text-only Order signed on March 8, 2007,  nothing was received from Plaintiff as of that date.  The Court, therefore, ordered that Defendant's pending Motion for Summary Judgment would be decided without the benefit of a response from Plaintiff, and that the Statement of Facts filed by Defendant was deemed to be admitted.  Consequently, most facts are taken from Defendant's Statement of Facts (Doc. No. 24.) and are undisputed for purposes of the pending motion.  Upon careful review of the record evidence, however, the Court discovered that there was some overreaching as to certain statements in Document No. 24.  Consequently, where a Statement of Fact is more closely akin to argument, or is an overstatement or misstatement of fact, the Court will be guided by the evidence of record, and Plaintiff, the nonmoving party, will be afforded all favorable inferences.  See Fed. R. Civ. P. 56 (c).

Plaintiff, an African American woman, was originally hired by Defendant as a Clerk Typist I on July 21, 1997 and was last employed as a Clerk Typist II for CYS until her separation from employment on September 24, 2003.  In December of 1997, Debbie Stacy was hired as a Clerical Typist I with CYS.  Both women worked side-by-side in Clerical Typist positions until October 2002 when Stacy was promoted to Clerical Supervisor and supervised all clerical staff.  Plaintiff did not apply for the Clerical Supervisor position as she was attending school and did not want the added responsibility.

In Paragraph 6 of her Amended Complaint, Plaintiff avers that she was "singled out and treated poorly because of her race."  (Amended Complaint ¶ 6.)  This alleged disparate

treatment included "being ignored by co-workers and supervisors, being criticized and disciplined for actions which did not result in criticism or discipline when engaged in by white co-workers, not being promoted, and not being fairly and promptly evaluated in performance evaluation, being unfairly suspended[,] and being constructively discharged." (Amended Complaint ¶ 6.) In support of these allegations, Plaintiff refers to the following events:

First, Plaintiff complains that on December 11, 2002, a caseworker at CYS, Ed Johnston, remarked that Plaintiff "looked like Buckwheat with glasses." In her Complaint, Plaintiff avers that supervisors failed to respond to her allegations. (Amended Complaint ¶ 7.) Plaintiff complained to Johnston's supervisor. Jeff Felton, CYS director, told Plaintiff that racism would not be tolerated, and as a result, Johnston was sent to diversity training. Johnston apologized to Plaintiff, but she would not accept his apology.

Next, Plaintiff avers that she "was denied a promotion to a senior clerical position in February, 2003 and involuntarily transferred to another position." (Amended Complaint ¶ 8.) She alleges that this denial was based solely on her race and not job performance. (Amended Complaint ¶ 8.) In deposition, Plaintiff admitted that this alleged denial of promotion was a lateral move that did not involve a pay raise. After complaining to her employee union, the County agreed to post vacancies in the future.

Plaintiff next avers in her Amended Complaint that Stacy, her supervisor, suspended Plaintiff for three days in March 2003 for alleged misuse of the business telephone. Plaintiff states that no steps were taken with regard to white co-workers for misuse of the phone, nor were alleged misuses by Plaintiff's white co-workers even investigated. (Amended Complaint ¶ 9.) Here again, Plaintiff admitted to making personal phone calls at work to her

children, mother, her credit union, her niece, an ex-fiancee who lived in Minnesota, her cousin in Minnesota, and to pay bills over the phone.  She further admitted that her phone abuse was "bad."  She also admitted to using a coworker's phone for  personal calls to her children after she had been suspended for the excessive phone calls.  Further, Plaintiff admitted that she had no information that others in her unit were using their phone for personal business to the same extent as Plaintiff.  The County's investigation of Plaintiff's phone use revealed that she made approximately $3000 of personal phone calls, and that she spent approximately two weeks worth of business time for personal phone calls.

In Paragraph 10 of the Amended Complaint, Plaintiff avers that "Stacy and other employees of the defendant threatened and verbally abused" her.  (Amended Complaint ¶ 10.)  When asked in discovery regarding specifics of this averment, Plaintiff responded that Stacy required her to report her whereabouts until Plaintiff left her employment with CYS.  Plaintiff also indicated that she felt harassed by this practice.  In a memorandum dated March 13, 2003, Stacy stated that Plaintiff was to advise Stacy each time she left for the morning and afternoon breaks, and for lunch.  Stacy testified that she issued this memorandum because Plaintiff was going out of Stacy's sight at times when Plaintiff should have been working in order to use the phone on the desks of other employees, and to use her cell phone in the lounge.  As required, Plaintiff wrote down the information requested by Stacy and gave it to her.  This practice of reporting to Stacy continued for a period of time that Plaintiff claims to be longer than a week, and maybe as long as one month.  Plaintiff does not know why or how this reporting practice stopped.  Plaintiff filed a charge with the EEOC dated March 22, 2003, claiming a continuing

violation of harassment from Spring 1998 through 2003, and retaliation.[1]  (Doc. 25-4 at 5.)

Other incidents described by Plaintiff in discovery involved CYS Director, Jeff Felton.  Plaintiff testified that on a couple of occasions, Felton would come into a room and would speak to three or four other individuals, but not to Plaintiff.  She could not recount how many times this happened.  Plaintiff indicated that she did not have to speak to Felton in order to do her job, and that she never complained to anyone about Felton not speaking to her.  Plaintiff also recalled a couple of times when Felton looked at Plaintiff's time card to ensure that she punched in and out on time.

In Paragraph 12 of the Amended Complaint, Plaintiff avers that Stacy went to Plaintiff's credit union office seeking personal and financial information about Plaintiff.  This incident allegedly took place before Stacy became Plaintiff's supervisor around the end of October 2002.  Stacy denied going to Plaintiff's credit union.

Plaintiff alleged she was constructively discharged on September 24, 2003; she averred that the "racially hostile work environment effectively prevented Plaintiff from continuing in her employment."  (Amended Complaint ¶ 15.)  In deposition, Plaintiff testified that she quit her job because she could not take the hostile work environment.  Previously, Plaintiff asked to have flextime on Wednesdays so that she could attend a nursing class.  Stacy told Plaintiff that she could have the flextime as long as she did filing for another caseworker. Plaintiff's union steward emailed Stacy regarding this issue and Stacy thereafter told Plaintiff

---

[1]Plaintiff filed a charge with the Pennsylvania Human Relations Commission on April 30, 2003, (Doc. No. 25-4, at 16-17), but did not include a Count in her first Amended Complaint pursuant to the Pennsylvania Human Relations Act.

that she could not have flextime.[2]  Plaintiff testified that she then quit because she was being

denied her education.  The flextime decision was within her supervisor's discretion but Plaintiff

felt that she had a right to use flextime.  Plaintiff had no information as to whether others who

had requested flextime had additional duties imposed upon them if they used it.  No other

employee was using flextime on a regular weekly basis.

            In her written discovery responses, Plaintiff describes other alleged instances of

jokes and comments as follows:

1.      Spring 1998–a coworker compared Plaintiff to one of his pets, a black Labrador

       Retriever; "his name is Pepper, just like you."

2.      August 11, 1999–Joke by HR director–"Where would you take white people for

       lunch—you take them to Cracker Barrel."  This was allegedly followed with an

       explanation by Jeff Felton to another individual regarding the slang use of "cracker" for

       white people.

3.      1999-a coworker allegedly stated "this agency is not going to work me like a 'nigger'."

       This comment was made in the presence of another African American employee, but not

       in front of Plaintiff.

4.      Summer 2000–A coworker made a comment to Plaintiff that she would like to get a tan

       and be as dark as Plaintiff, but not as dark as another African American employee.

5.      2001–an employee discussed seeing a white coworker with her "bi-racial"children in the

       mall.  Harris was not present when this comment was made.

_____

      [2]The precise dates concerning Plaintiff's request for flex time, Stacy's permission for
Plaintiff to use flex time, and Stacy's subsequent revocation of the flex time benefit, is unclear
from the record.

6.      Spring 2002–The director asked Plaintiff if the headband she was wearing was "an ethnic

thing."  Plaintiff states that his tone was "condescending and definitely derogatory."

7.      Before Stacy's promotion in October 2002–Stacy complained about "Mexicans" coming

to the country and getting a free ride.  Plaintiff argues this is discriminatory because

Stacy "specifically said a certain race of people."

        B.      Legal Standard

        Summary judgment is appropriate if, drawing all inferences in favor of the

nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file,

together with the affidavits, if any, show that there is no genuine issue of material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment

may be granted against a party who fails to adduce facts sufficient to establish the existence of

any element essential to that party's case, and for which that party will bear the burden of proof

at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing

that there is a genuine issue for trial" or the factual record will be taken as presented by the

moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e) (emphasis added by

Matsushita Court).  An issue is genuine only "if the evidence is such that a reasonable jury could

return a verdict for the non-moving party."  Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248

(1986).

7

C.    <u>Analysis</u>

1.  <u>Hostile Work Environment</u>

Plaintiff avers that she was subjected to a hostile work environment based on her race in violation of Title VII.  Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).

In order to state a claim for hostile work environment based upon race, Plaintiff must establish the following five elements: (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her (subjective test); (4) the discrimination would detrimentally affect a reasonable person of the same race in her position (objective test); and (5) the existence of respondeat superior liability.  <u>See</u> <u>Abramson v. William Patterson College of New Jersey</u>, 260 F.3d 265, 276-77 (3d Cir. 2001) (citations omitted); <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 426 (3d Cir. 2001) (citing <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 (3d Cir. 1990)).  Thus, to withstand summary judgment on a hostile work environment claim, the plaintiff must present "sufficient evidence to give rise to an inference of discrimination by offering proof that her 'workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of [her]  employment and create an abusive working environment,' . . . and the conduct is based [upon plaintiff's race]."  <u>Abramson</u>, 260 F.3d at 278-79 (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).

In determining whether the Plaintiff has established the <u>prima facie</u> elements of a

hostile work environment claim, the Court is required to evaluate the whole record.  See Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir. 2001) (citing Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999); Harris, 510 U.S. at 23).  As noted by the United States Court of Appeals for the Third Circuit, the court has an obligation to be "increasingly vigilant against subtle forms of discrimination" and therefore must allow plaintiffs to prove discrimination indirectly by looking at all of the conduct, including facially neutral behavior, in determining whether plaintiffs have met their burden of proof.  Id. at 261 (citing Durham, 166 F.3d at 148; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081-84 (3d Cir. 1996)).

Defendant argues that there is insufficient evidence in the record to support Harris' hostile work environment claim.  Instead, Defendant contends that the facts only evidence isolated incidents that "can at worst be characterized as sporadic, discourteous or rude stray remarks."  (Brief in Support of Motion for Summary Judgment, Doc. No. 23 at 10.) Specifically, Defendants argue that these facts do not demonstrate that the "terms and conditions of her employment" were detrimentally affected.  In addition, Defendant states that Plaintiff cannot show respondeat superior liability in that the alleged discriminatory environment was not created by a supervisor or other authority over the employee.  Finally, Defendant argues that it can prevail on the Faragher affirmative defense in that it exercised reasonable care to prevent any harassing behavior, and Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  (Brief in Support of Motion for Summary Judgment, Doc. No. 23 at 13-14.)

Although most facts as presented by defendant are deemed admitted for purposes of Defendant's Motion for Summary Judgment, this Court cannot grant judgment as a matter of

law on Plaintiff's hostile work environment claim.  These facts and others reflected in

Defendant's submissions to this Court demonstrate that there are genuine issues for trial.

First, the record reflects a sequence of events that unfold against the backdrop of

racist remarks, including remarks made by a supervisor and various directors[3].  In August 1999,

the Director of Human Resources, accompanied by the then Children and Youth Director, the

Assistant Director and present Director who was employed by Human Resources at that time,

approached Plaintiff and told her he wanted to tell her a joke.  He asked Plaintiff, "Where would

you take white people to lunch?"  Plaintiff responded that she didn't understand what he meant.

He responded with, "You take them to Cracker Barrel."  The present Director, Jeff Felton,

explained that "cracker" was a name for white people.  Plaintiff indicated that it was a rude joke

and complained to the then Director.  The Director of Human Resources apologized and asked

plaintiff why she was offended by the joke.  No other disciplinary action was taken.  (EEOC

documents attached to Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No.

25-4, at 13; Harris Dep. at 82.)

In the Spring of 2002, "the Director" commented upon a headband that was

matching in pattern to Plaintiff's outfit and asked whether it was an "ethnic thing."  Plaintiff

stated that his tone was "condescending and definitely derogatory."  (EEOC documents attached

to Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No. 25-4, at 14.)

---

[3]Plaintiff also contends that various racists remarks were made by coworkers.  Some were
made in her presence, others were not.  A sampling of these remarks include the remark to
Plaintiff in Spring 1998 that she looked like a coworker's black Labrador Retriever, "Pepper,"
and the comment to Plaintiff by a coworker in the Summer of 2000 that she wanted to get a tan
and be Plaintiff's color, but not as dark as another African American employee.  (EEOC
documents attached to Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No.
25-4, at 13.)

After lodging an official complaint regarding the "Buckwheat comment" in December 2002,[4] Plaintiff testified that Jeff Felton, the director of her department, indicated that such behavior would not be tolerated and that the caseworker responsible for the comment, Ed Johnston, would be sent to diversity training.  Thereafter, Harris and Felton had a conversation about racism and Felton told Harris the following:

> A.                         . . .
>
> And he told me a story about if there was a group of white kids on one side of the street and a group of black kids on the other side, what side he would walk on.

(Harris Dep. at 36.)  Plaintiff indicated in her EEOC documents that Felton told her that "it was only natural that he would walk on the side with the white kids."  (EEOC documents attached to Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No. 25-4, at 14.)  Plaintiff's deposition testimony continues as follows:

> So when we went to the luncheon, she [Debbie Stacy] wanted me to tell everybody at the lunch table what Ed called me, and I guess they forgot about it or whatever, but Ed only had to go to diversity training.

(Harris Dep. at 36.)

Next, a jury could find that the harassment was pervasive.  Beginning with the "buckwheat comment" in December 2002, circumstances and events described below occurred

---

[4]Plaintiff testified as follows regarding the details surrounding the "Buckwheat comment:"

> A.    I was in the back at the fax machine or something, and he [Ed Johnston] came and put his arm around me.  He said, "I just wanted to tell you you look nice.  You look just like Buckwheat with glasses."  So I went to the immediate supervisor.

(Harris Dep. at 37.)

in a time period of less than one year, culminating in Plaintiff's resignation.  These events had a direct effect on Plaintiff's working conditions, and the cumulative effect of all events, could be found to create a hostile working environment.  Taken as a whole and considered against the backdrop of racists remarks by a supervisor and various directors as detailed above, the following events indicate that the level of harassment rose to such a level of pervasiveness so as to withstand a motion for summary judgment:

1.      In February 2003, Plaintiff applied for a lateral transfer to a position that she considered more desirable; Plaintiff would be performing the same job for the same pay but with a different group of people.  The position was not posted even though all openings were required to be posted.  The decision as to whether to hire Plaintiff was at the discretion of either Stacy or Felton.  Plaintiff testified that she was given some "bogus" reason as to why she did not receive the transfer even though she was the most senior employee.  Plaintiff complained and a decision was made to post all future vacancies.  (Harris Dep. at 66.)  A new employee was hired for this position who quit after four to five weeks.  Thereafter, the position remained vacant.  (EEOC documents attached to Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No. 25-4, at 10.)

2.      In March 2003, without any verbal or written warnings as allegedly required by union grievance procedures, Plaintiff was suspended for three days without pay for excessive use of the business phone for personal matters.  Although Plaintiff admitted that her abuse of the phone was "bad," she contends that the individual whose phone usage was used as a comparison to hers was not representative of most employees' phone usage and that she was being singled out.  (EEOC documents attached to Plaintiff's Answers to

Defendant's First Set of Interrogatories, Doc. No. 25-4, at 12-13; Harris Dep. at 30-33.)

3.     On March 13, 2003, Plaintiff received an internal memorandum from her supervisor Stacy that required Plaintiff to notify Stacy each time she left her desk "for any length of time" and to further indicate where Plaintiff could be found.  The Memorandum further provided that if Stacy were not at her desk when Plaintiff was leaving hers, Plaintiff was to "leave written documentation" regarding her whereabouts.  (Doc. No. 25-9.)  Plaintiff indicated that this requirement applied to all situations where she would be away from her desk for more than 10 minutes, "even to go to the copy center (on the other side of the office)."  (EEOC documents attached to Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No. 25-4 at 10.)

4.     Plaintiff testified that Felton, after receiving her papers from the EEOC, would check her time card; she testified that he did not check the time card of other employees.  (Harris Dep. at 55-56.)

5.     Plaintiff also testified that from March 2003 until September 2003, Felton would ignore her and speak to all other employees in a room about personal or business matters but would not speak to Plaintiff.  Plaintiff also indicated that at times her supervisor Stacy would ignore her.  (Harris Dep. at 52, 56, 87.)

6.     Prior to Plaintiff's separation from Defendant in September 2003, Plaintiff requested flex time so that she could attend a Chemistry class that was only offered on this day. Plaintiff had been working towards her nursing degree on Saturdays, but Wednesday was the only day this required class was offered.  Initially, Stacy granted her the flex time on the condition that she perform some back filing for another employee.  Plaintiff agreed.

Thereafter, there was some disagreement between Plaintiff's union representative who questioned Stacy as to why Plaintiff was required to do another employee's work. Thereafter, Stacy informed Plaintiff that she could no longer have flex time. (Harris Dep. at 57-59.) Plaintiff indicated that the additional filing from the other employee was too much work for one person but she agreed to do it so she could get the flex time and complete her education. (Harris Dep. at 61-62.)

7.      By September 24, 2003, Plaintiff contends that the situation became so oppressive that she was constructively discharged.

        As to the third prong, a jury could reasonably conclude that Harris was detrimentally affected by this work environment. In deposition, she testified that the conditions at work had gotten so bad that she "was scared to talk, scared to move, scared to breathe." (Harris Dep. at 56-57.) She noted that after the Defendant received the EEOC papers, she didn't talk to anyone, she just did her work, and kept to herself. (Harris Dep. at 56.) She also indicated that the reporting requirements whenever she left her desk were "quite embarrassing." (EEOC documents attached to Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No. 25-4, at 11.) Plaintiff also indicated that she has treated with Dr. Robert J. Fagioletti and was treated with Zoloft and Ativan for over one year. (Plaintiff's Answers to Defendant's First Set of Interrogatories, Doc. No. 25-4, at 29.)

        As to the objective test of the fourth prong, the Court must consider all of the circumstances. These circumstances may include the frequency of the discriminatory conduct, its severity, whether it is humiliating or merely an offensive utterance, and whether the conduct interferes with an employee's ability to perform his or her job. Harris, 510 U.S. at 23. This

14

Court finds that the record in this case reflects facts, such as those set forth above, that a jury

could find a reasonable person of Plaintiff's race would find the conduct to be so harmful that it

altered her working conditions.

Finally, a jury could find that the existence of respondeat superior liability.

The United States Supreme Court described the basis for employer liability in <u>Faragher v. City

of Boca Raton</u>, 524 U.S. 775 (1998), as follows:

> An employer is subject to vicarious liability to a victimized employee for an
> actionable hostile environment created by a supervisor with immediate (or
> successively) higher authority over the employee.  When no tangible employment
> action is taken, a defending employee may raise an affirmative defense to liability
> or damages . . ..  No affirmative defense is available, however, when the
> supervisor's harassment culminates in a tangible employment action . . ..

<u>Id</u>. at 807-08.  A tangible employment action is one that "constitutes a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits."  <u>Burlington

Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998).  The United States Supreme Court also

made clear that a constructive discharge is functionally the same as an actual termination, and

when an official act underlies the constructive discharge, the affirmative defense is not available

to the employer.  <u>Pennsylvania State Police v. Suders</u>, 524 U.S. 129, 148 (2004).  Here, a

reasonable factfinder could find that Plaintiff's supervisor and the director of her department

engaged in official acts of the Defendant, including the phone abuse discipline, the March 13,

2003 Memorandum requiring Plaintiff to report her whereabouts, and the suspension of flex time

privileges[5], all culminating in Plaintiff's constructive discharge.  Consequently, Defendant is not

---

[5]Defendant suggests that because the granting of flex time was in her supervisor's
discretion, Plaintiff had no right to flex time and cannot complain that the benefit was

entitled to judgment as a matter of law on its <u>Faragher</u> defense.

In conclusion, the Court looks to the language of the United States Court of

Appeals for the Third Circuit in <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279 (3d Cir.

2000), in recommending that Defendant's Motion for Summary Judgment be denied:

> We recognize that different inferences might be drawn from the evidence
> presented in the record.  On summary judgment, however, when viewing the
> sufficiency of the prima facie case, our role is not to act as factfinder.  Instead, we
> must consider the evidence taken in the light most favorable to the non-movant
> and determine whether [the Plaintiff] can show [the elements] required for a
> prima facie case . . . .

206 F.3d at 286, <u>quoted in part in</u>, <u>Abramson</u>, 260 F.3d at 289.  There is sufficient evidence in

the record from which a reasonable factfinder could draw inferences establishing Plaintiff's

claim for hostile work environment.  Therefore, Summary Judgment should be denied.


2. <u>Title VII Racial Discrimination</u>

Plaintiff appears to allege discrete instances of disparate treatment under Title

VII.   A claim for discrimination based on race is analyzed under the legal framework of

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), which employs the familiar

burden shifting  analysis.  Initially, the plaintiff has the burden of establishing a <u>prima facie</u> case

of employment discrimination.  <u>Jones v. School Dist. of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir.

---

suspended.  (Brief in Support of Motion for Summary Judgment, Doc. No 23 at 6.)  The United
States Supreme Court has held, however, that simply because an employer has no obligation to
provide a certain benefit, does not empower the employer to administer the benefit in a
discriminatory fashion.  <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 75 (1984).  Thus, even if the
granting of flex time was within her supervisor's discretion, Defendant is not permitted to
suspend the granting of this benefit because of discriminatory animus.

1999).  If the plaintiff successfully establishes her <u>prima</u> <u>facie</u> case, the burden then shifts to the

employer to "'articulate some legitimate, nondiscriminatory reason for the employee's

rejection.'"  <u>Id</u>. (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802).  Once the employer carries its

burden, the burden shifts back to plaintiff to prove by a preponderance of the evidence that the

legitimate reasons proffered by the employer were not the true reasons, but were merely a pretext

for discrimination.  <u>Id</u>. (citing <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-

53 (1981)).

       Pursuant to the disparate treatment theory, a <u>prima</u> <u>facie</u> case of discrimination is

established when the plaintiff shows that: (1) she is a member of a protected class; (2) she is

qualified for the position; (3) she suffered an adverse employment action; and (4) members

outside the protected class were treated more favorably.  <u>Jones</u>, 198 F.3d at 410-11.  The

question of whether Plaintiff has established her <u>prima</u> <u>facie</u> case is a question of law to be

determined by the Court.  <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir.

2003).

       The Defendant concedes for purposes of this motion only, that Plaintiff can

establish a <u>prima</u> <u>facie</u> case regarding her March 13, 2003 discipline.  (Brief in Support of

Motion for Summary Judgment, Doc. No. 23 at 16.)  Accordingly, pursuant to the <u>McDonnell</u>

<u>Douglas</u> burden shifting paradigm, Defendant argues that it has "met its burden of producing

legitimate and nondiscriminatory reasons for disciplining Harris on March 13, 2003 for abuse of

the business phone," and that Harris does not dispute this as she admitted  that she was wrong in

her excessive use of the phone.  (Brief in Support of Motion for Summary Judgment, Doc. No.

23 at 17.)  Defendant continues that the only relevant inquiry remaining "is whether [Defendant]

CYS had a legitimate reason for disciplining Harris on March 13, 2003." (Brief in Support of Motion for Summary Judgment, Doc. No. 23 at 17.)

Defendant is correct that the burden now shifts to Plaintiff. Plaintiff must now "proffer evidence that is sufficient to allow a reasonable finder of fact to find by preponderance of the evidence that the employer's proffered reasons are false or pretextual." Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (citing Sarullo, 352 F.3d at 797).

To survive a motion for summary judgment at step three of the burden shifting analysis, Plaintiff must present some evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992)). In Fuentes, the United States Court of Appeals for the Third Circuit further explained the quantum of proof required at step three as follows:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Fuentes, 32 F.3d at 765 (emphasis in original) (quoting Ezold, 983 F.2d at 531) (other internal quotations omitted).

Turning to prong one of the <u>Fuentes</u> analysis, whether Plaintiff has presented some evidence from which a reasonable jury could disbelieve the employer's articulated reasons, the record reflects evidence that is sufficient to allow a reasonable factfinder to find by preponderance of the evidence that Defendant's reasons for the March phone discipline are suspect.  Although Plaintiff admitted that her use of the phone was "bad," the record does not reflect that others who abused the business telephones were disciplined to the extent commensurate with their own abuses.  Moreover, Plaintiff raised an issue as to whether the one individual whose phone use was compared to hers, displayed phone habits that were representative of most employees in Plaintiff's department; record evidence reflects that employees routinely used the business phones for personal matters.  (Harris Dep. at 41, 43, 45-46; Stacy Dep. at 24.)  In addition, Plaintiff contends that she was given the three day suspension without benefit of required verbal or written warnings, and there was no written policy regarding business phone use and when personal use would be considered excessive.  (Harris Dep. at 33, 84.)

As to Prong Two of the <u>Fuentes</u> analysis, evidence in the record may allow "the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  <u>Fuentes</u>, 32 F.3d at 762.  Evidence of discriminatory animus by Plaintiff's supervisor and department head appears in the record as early as August 1999 and continues through Plaintiff's separation from employment.[6]

---

[6]Defendant is incorrect in its assertion that any discrete incidents prior to May 27, 2002 are time barred because 42 U.S.C. § 2000e-5(e)(1) allows 300 days from the date of an alleged discriminatory act for the filing of a charge and Plaintiff filed her EEOC Complaint on March 22, 2003.  Defendant fails to consider an equitable exception to the timely filing requirement: the continuing violation theory.  Pursuant to the continuing violation theory, a "plaintiff may pursue

3. <u>Constructive Discharge</u>

Defendant argues that Plaintiff's "constructive discharge claim fails because she did not avail herself the opportunity to remedy the alleged harassment by utilizing the preventive or remedial procedures and she quit voluntarily to pursue her nursing degree."  (Brief in Support of Motion for Summary Judgment, Doc. No. 23, at 19-20.)

The affirmative defense invoked by Defendant will not apply where "the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation . . .."  <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 134 (2004).  On the facts deemed undisputed by this Court, as well as other facts of record, and drawing all inferences therefrom in favor of Plaintiff, a reasonable factfinder could find that Plaintiff's supervisor and the director of her department engaged in official acts of the Defendant, including the phone abuse discipline, the March 13, 2003 Memorandum requiring Plaintiff to report her whereabouts, and the suspension of flex time privileges, all culminating in Plaintiff's constructive discharge.  Consequently, Defendant is not entitled to judgment as a matter of law on its <u>Faragher</u> defense.

_____

a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant."  <u>West v. Philadelphia Elec. Co.</u>, 45 F.3d 744, 754 (3d Cir. 1995) (citing <u>Bronze Shields, Inc. v. New Jersey Dep't of Civ. Serv.</u>, 667 F.2d 1074, 1081 (3d Cir. 1981); <u>Jewett v. Int'l Tel. and Tel. Corp.</u>, 653 F.2d 89, 91 (3d Cir. 1981)).  The Third Circuit Court of Appeals has noted that a hostile work environment claim and the continuing violation theory have similar requirements of frequency or pervasiveness, and has recognized a natural affinity between them. <u>West</u>, 45 F.3d at 755.  A discussion and application of the theory is not required here, as the facts of record from May 27, 2002 through September 24, 2003, may permit a reasonable "factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  <u>Fuentes</u>, 32 F.3d at 762.

As to Defendant's argument that Plaintiff voluntarily quit to pursue her nursing degree, the record reflects facts from which a reasonable factfinder could conclude that Plaintiff was constructively discharged.  To establish a constructive discharge claim, a plaintiff must show that not only was the harassing behavior sufficiently severe or pervasive so as to alter the conditions of employment, but that "the abusive working environment became so intolerable that her resignation qualified as a fitting response."  Pennsylvania State Police, 542 U.S. at 134. Although the record reflects that one of the culminating events leading to Plaintiff's separation from employment was the suspension of flex time privileges, which prevented her from pursuing her nursing degree, she also testified that her working environment became so oppressive that she "was scared to talk, scared to move, scared to breathe."  (Harris Dep. at 56-57.)  Under these conditions, she indicated that she was forced to quit her job with Defendant.  Consequently, Defendant's Motion for Summary Judgment on Plaintiff's constructive discharge claim should be denied.

### 4.  Retaliation

Finally, Plaintiff has brought a claim for retaliation based on race.  Defendant argues that summary judgment must be granted on Plaintiff's retaliation claim because she failed to engage in any activity protected by Title VII, nor was she subject to an adverse employment action.  Defendant also argues that there is no causal link between the protected activity and the employer's adverse action.  (Brief in Support of Motion for Summary Judgment, Doc. No. 23 at 20-21.)

To withstand summary judgment on her retaliation claim, Plaintiff must establish

21

a prima facie case of retaliation, which consists of three elements: (1) Plaintiff was engaged in a protected activity; (2) she was subjected to an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the employer's adverse action.  See Sarullo, 352 F.3d at 800 (citation omitted); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) (citations omitted); Crumpton v. Potter, 305 F. Supp.2d 465, 474 (E.D. Pa. 2004) (citation omitted).  If Plaintiff establishes a prima facie case of retaliation, the burden then shifts to Defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).  Once the Defendant comes forward with a legitimate, non-retaliatory reason, Plaintiff will avoid summary judgment by showing an issue of fact exists regarding whether  Defendant's proffered reason is pretextual.  Id.  (citation omitted); Crumpton, 305 F. Supp.2d at 474.

This Court is instructed by the United States Court of Appeals for the Third Circuit regarding the first prong of the prima facie case in Abramson, 260 F.3d at 287-88.  There, the court noted that a formal letter of complaint to an employer or to the EEOC are not the only acceptable means of engaging in a protected activity for purposes of establishing the first prong of a prima facie case for retaliation.  Id. (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995)).  Instead, noted the court, acceptable forms of protected activity include informal protests of discriminatory practices as well, including complaints to management.  In Abramson, the court concluded that the complaints to the college, "whether oral or written, formal or informal," were sufficient to satisfy the first element of the prima facie case.  260 F.3d at 288.  Here, Plaintiff's complaints to management regarding the "Buckwheat comment" and

the Cracker Barrell joke, as well as the charge filed with the EEOC and PHRC, satisfy the first

prong of her prima facie case.

In Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006),

the United States Supreme Court discussed the second prong of the prima facie case.  In

Burlington Northern, the Court discussed the element of adverse employment actions and

concluded "that the anti-retaliation provision does not confine the actions and harms it forbids to

those that are related to employment or occur at the workplace."  Id. at 2409.  Further, the Court

indicated that "the employer's actions must be harmful to the point that they could well dissuade

a reasonable worker from making or supporting a charge of discrimination."  Id.  The Court

emphasized that the adverse action must be materially adverse so as to distinguish it from mere

trivial harms, because Title VII does not set forth "a general civility code for the American

workplace."  Id. at 2415 (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80

(1998)).  Likewise, the Court highlighted the fact that the reactions of a reasonable employee to

the adverse action must be examined because the standard for judging the harm and whether it

would deter an employee from complaining of discrimination must be objective.  Id. at 2415.

Finally, the Court stated that "context matters," because the real impact of workplace behavior

depends upon all the circumstances, expectations and relationships in a given situation.  Id.

The record here reflects several adverse employment actions for purposes of

satisfying the second element of Plaintiff's prima facie case.  First, in the context of Plaintiff's

position and her expectations that the most senior employee would be entitled to the lateral

position, that she would be working with an entirely different group of people at a time when she

was having difficulty with the personalities in her present department, the failure of the

Defendant to post the position, its hiring of an individual from outside the Defendant, and the subsequent failure to fill the position after the new hire's premature departure, would qualify as an adverse employment action. See Id.  Clearly, Plaintiff's suspension without pay for three weeks also qualifies.  The subsequent March 13, 2003 memorandum evidencing her supervisor's requirement that Plaintiff report her whereabouts would also constitute an adverse employment action as it placed an onerous burden on Plaintiff's day to day activities in the workplace, thereby materially affecting the terms and conditions of employment.  Finally, the suspension of Plaintiff's flex time benefit, would also qualify.

Regarding the third prong of the prima facie case, the United States Court of Appeals for the Third Circuit in Abramson emphasized that its case law has focused on the two main factors of timing, and evidence of ongoing antagonism, in finding the causal link necessary for retaliation.  260 F.3d at 288 (discussing Farrell, 206 F.3d at 281).  The law in this Circuit is fairly well established that mere temporal proximity between the protected activity and the adverse employment action ordinarily will not be sufficient to meet Plaintiff's burden of demonstrating a causal connection between the two events, unless the interim period is so short as to be unusually suggestive of retaliatory motive.  Compare Jalil, 873 F.2d at 708 (temporal proximity alone was enough to establish causation where adverse employment action occurred two days after the protected activity, and there were no allegations of wrongdoing by the employee during that time); with Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189 (3d Cir. 2003) (holding ten day time period between protected activity and adverse employment action, along with evidence that supervisors made comments regarding plaintiff's EEOC complaint in close proximity to her discharge, was sufficient to survive summary judgment);

24

Zappan v. Pa. Bd. of Probation & Parole, No. Civ. A. 00-1409, 2002 WL 32174230, * 10 (E.D. Pa. Nov. 25, 2002) (two month period in between protected activity and adverse employment action was not unusually suggestive to demonstrate causation without more evidence); Pritchett v. Imperial Metal & Chemical Co., No. Civ. A. 96-0342, 1997 WL 570929, *4 (E.D. Pa. Sept. 8, 1997) (same); Nixon v. Runyon, 856 F. Supp. 977, 988 (E.D. Pa. 1994) (no causation inferred from mere passage of four months); Woods v. Bentsen, 889 F. Supp. 179, 188 (E.D. Pa. 1995) (no causation inferred from mere passage of five months).  Thus, where temporal proximity alone is not enough to infer causation, a plaintiff can avoid summary judgment by  producing other evidence of causation, such as, for example, producing evidence of a pattern of antagonism or retaliatory motive during the intervening period, or by showing inconsistent reasons given by the employer for the adverse employment action.  Farrell, 206 F.3d at 280-81 (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177-78 (3d Cir. 1997) (pattern of antagonism); Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986) (inconsistent reasons for termination)); see also Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997) (where temporal proximity is lacking, courts may look to the intervening period for other evidence of retaliatory animus; Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 512-13 (3d Cir. 2003)) (holding that in cases where "the temporal proximity is not so close as to be unduly suggestive," the court of appeals has recognized that "timing plus other evidence may be an appropriate test").  The Court notes, however, that these factors are not the exclusive means of establishing causation, and that the totality of the evidence may also provide the necessary inference.  See, e.g., Farrell, 206 F.3d at 280 (citing Kachmar, 109 F.3d at 177).

On the record here, a reasonable factfinder could find sufficient evidence of ongoing antagonism beginning as early as 1999 against the backdrop of racist remarks, continuing with Plaintiff's complaint to management about the "Buckwheat comment," denial of the transfer position despite Plaintiff's arguably reasonable expectations that she was next in line for the position, her three day suspension without pay for phone abuse without required verbal or written warnings, the subsequent requirement by her supervisor to report her whereabouts, Felton's silent treatment and checking Plaintiff's time card subsequent to her filing of the EEOC charge, and the suspension of the previously granted flex time benefit, all culminating in Plaintiff's alleged constructive discharge.

Contrary to Defendant's arguments, this Court concludes that there is sufficient record evidence to satisfy all three elements of Plaintiff's prima facie retaliation claim so as to withstand summary judgment.  Therefore, Defendant's Motion for Summary Judgment should be denied.

III.   <u>CONCLUSION</u>

It is respectfully recommended that Defendant Washington County Children & Youth Services' Motion for Summary Judgment at Doc. No. 22 be denied.

In accordance with the Magistrate Judge's Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond

thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.



LISA PUPO LENIHAN
United States Magistrate Judge


Dated : June 4, 2007


cc:     The Honorable Joy Flowers Conti
        United States District Judge

        All counsel of record